# EXHIBIT H

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3

4     DARELTECH, LLC,

5                    Plaintiff,

6     vs.                              No. 4:18-CV-00702-ALM

7     SAMSUNG ELECTRONICS CO., LTD.,

      et al.,

8

                      Defendants.

9     _____

10

11

12

13

14           DEPOSITION OF TAJANA SIMUNIC ROSING

15                 San Diego, California

16               Friday, October 18, 2019

17

18

19

20

21

22    Reported by:

      DENISE MARLOW

23    RPR, CSR No. 11631

24

25

1      Q.  Do you have any opinion on his qualifications as

2   an expert?

3      A.  I saw his résumé.  And depending on how one

4   defines person of ordinary skill in the art, I do have

5   some questions as to how well he could represent certain

6   aspects of this case.  But that, again, is just based on

7   only what I saw in his résumé, since I don't know

8   anything more about him.

9      Q.  And what were the questions that you had

10  concerning his qualifications?

11     A.  What I saw is that he has a degree, I believe,

12  in business of some sort.  I think looking at his C.V.

13  would refresh my memory.  And he does seem to have some

14  experience in software.  However, I believe that a

15  person of ordinary skill in the art as it is relevant to

16  these particular patents in question really should have

17  a four-year bachelor's in electrical engineering,

18  computer science, or computer engineering, coupled with

19  at least one year of experience in systems or

20  user-interface design.  And I do not believe that he

21  actually has that kind of experience, again, just based

22  on the single document that I saw.

23     Q.  Okay.  What do you understand your purpose in

24  this case to be, at least at this juncture?

25     A.  I was asked to provide opinion on some of the

Page 17

1  applications.

2          As a part of that class, students have to work

3  on a power management project.  And as a part of that,

4  I've developed a whole infrastructure that includes

5  applications that they can test with, low-level

6  operating system codes, some of the interfaces to device

7  drivers, and as well as measurement infrastructure that

8  would allow students to design and test their power

9  management strategies.

10         This class I teach every year.  Normally I have

11  about -- it varies between 30 to about hundred students,

12  usually master's and Ph.D. level; normally electrical

13  engineering, computer science, or computer engineering

14  background.

15     Q.  Have any of the applications that you've worked

16  on been commercially released?

17     A.  Are you referring to Android specifically or any

18  application?

19     Q.  Let's start with Android.

20     A.  I have never commercially released Android

21  applications.  However, students that I have taught have

22  written and released applications and have sent me

23  e-mails thanking me for what I've taught them in the

24  class and stating that it was that knowledge that was

25  most instrumental in them being successful in their job

1   and in the applications that they have designed.

2       Q.   Have any of the students who worked on a project

3   relating to power management in your CSE 237A class

4   released their project commercially, to your knowledge?

5       A.   I believe it might have happened, but I don't

6   remember exactly.  I think a couple of students had

7   planned to do this a few years ago, and I honestly did

8   not follow up.

9       Q.   What programming language is used in connection

10  with that class?

11      A.   It depends a little bit on the level of the

12  project that students choose to do.  We use Java,

13  Python, and C generally, most.  Now, again, some of the

14  projects will require some specialized code as well, so

15  I make it open and possible for students to use whatever

16  is most appropriate.

17      Q.   What do you mean by "specialized code"?

18      A.   So some of the students have wanted to write

19  code that is specific to a little more sophisticated

20  machine learning in statistical data processing

21  algorithms, so they've used tools that are related to

22  that as a part of the project that then interface with

23  standard Java or Python or C code.

24      Q.   In connection with that class, do you teach the

25  students anything regarding touch screens, capacitive

Page 32

1    actually in the charts and in the supplemental

2    disclosure report.

3        Q.   So you have not seen the IPR -- the petitions

4    for IPR in connection with the three patent suits?

5        A.   I have not looked at anything other than the

6    documents listed here.

7        Q.   Okay.  What percentage of your time do you

8    dedicate to your expert witness role?

9        A.   That varies depending on how many cases I have

10   at the time, but never more than 20 percent, because

11   that is the limit that UCSD allows faculty.

12       Q.   Let's talk about your educational background.

13   You started with a bachelor's in electrical engineering?

14       A.   Correct.

15       Q.   And that's at -- that was at Northern Arizona

16   University?

17       A.   Yes.

18       Q.   Do you remember any of the courses that would

19   have had any relevancy to the patents in suit here?

20       A.   Back then?  Yeah, I took a class in C

21   programming.  I also worked on a research project that

22   actually had to do with user-interface design on Macs.

23   I'm not sure if that's directly listed, but it's

24   actually under Northern Arizona University professional

25   experience.  The bullet says "Modeled tether dynamics

1    Q.  If the term "mathematical" is omitted from

2   mathematical upscaling, would your opinion change as to

3   what the meaning of "upscaling" would be?

4    A.  I was asked to provide opinion on

5   "mathematically upscaling" term, and that is the opinion

6   that I formed so far.  I was not asked to think about an

7   alternative.  So at this point I don't have an opinion

8   to provide.

9    Q.  Well, where in the patent is there any

10  discussion about mathematically upscaling something or

11  using mathematical techniques?

12   A.  So as we discussed, mathematical upscaling is

13  clearly listed in the claims of this patent.

14   Q.  But is there any -- in the specification which

15  precedes the claims, is there any mention of a

16  mathematical technique for upscaling?

17   A.  I don't believe that there is detailed

18  discussion on mathematical upscaling.  However, it does

19  appear in the file history, and in fact it was one of

20  the critical components that allowed these claims to be

21  accepted, from what I understand.  And the relevant

22  documents are listed in my table.  This is Exhibit 1,

23  and it is on page 1 of the part B of Exhibit 1, under

24  "intrinsic evidence" -- or should I say defendants'

25  evidence, and then intrinsic evidence subsection.

1   control different components of the screen and of the

2   display.  In context of this particular patent, it seems

3   fairly clear, especially when it comes to the phrase

4   that we've talked about -- and the phrase is "a section

5   portion of the display screen and associated sensors,

6   which is configured in a powered-off state and incapable

7   of receiving user input" -- that we're talking about the

8   situation in which display and sensors are both powered

9   off and therefore cannot respond, not capable of

10  detecting user's input.

11       Q.  Have you seen instances where touch sensors

12  could be turned off in part, not in whole; so in other

13  words, a part of the entire touch sensor array would be

14  turned off?

15       A.  I have seen examples, and actually there are a

16  couple of patents that I've listed.  I believe those are

17  listed on page 4 of the -- think this is No. 1 -- yeah,

18  Exhibit 1, Section B, under defendants' evidence.

19       Q.  Okay.  You're referring to Chou and Law?

20       A.  Exactly, the two patents.

21       Q.  Have you ever heard of any commercialized

22  sensors that could be turned off in a localized fashion?

23       A.  I don't remember seeing some.  I have looked

24  into that in my own research years ago, and it seemed

25  that it would be technically doable.  It also seemed

1  that it might involve more costly changes, so I did not

2  do it myself.

3    Q.  Do any of the patents in suit contain any

4  description about how you would implement turning off a

5  portion of touch sensors in a device?

6    A.  The patents in suit clearly state that there is

7  a second portion of the display screen and associated

8  sensors, which both of are powered off.

9    Q.  But aside from saying "powered off," is there

10  any -- and you researched this.  Right?  Is there -- if

11  a person of ordinary skill in the art read the patent,

12  could they understand how to turn off those sensors?

13         MR. NISHIMOTO:  Objection.  Form.

14         THE WITNESS:  The patent, I don't believe

15  specifically discusses the mechanism.  But it is

16  something that was well known for the person of ordinary

17  skill in the art, as the patents that are relevant to

18  such capability were already published at that time, so

19  it would not have been a difficult thing to do.

20  BY MR. HECHT:

21    Q.  Is it your position that two patent publications

22  would constitute something being well known, for a

23  person of ordinary skill?

24    A.  It is my position that the two patents are an

25  example of technology that exists, and somebody with

Page 79

1  patent?

2      A.   I believe that a person of ordinary skill in the

3  art is never in a vacuum.  They always have the context

4  of their knowledge.  They have context of the

5  information that's available to them beyond their own

6  knowledge and that they would have been wise to leverage

7  it.

8      Q.   You're suggesting that they would be -- that a

9  person of ordinary skill of the art, if they don't have

10  information in their own experience, would look to or

11  search for Chou and Law, among others --

12          MR. NISHIMOTO:  Objection.  Form.

13  BY MR. HECHT:

14      Q.   -- to fill in gaps?  Sorry.

15      A.   I gave those -- the two patents as an example

16  that is illustrative example of the fact that that

17  technology existed.  I do believe that a person of

18  ordinary skill in the art as defined as somebody who has

19  degrees in electrical engineering, computer engineering,

20  or computer science, and at least one year of experience

21  of user-interface design and system design should have

22  enough skills to be able to design a system that seems

23  they have in fact proposed in these patents.

24      Q.   Okay.  Would a person of ordinary skill in the

25  art understand that touch screens are not normally shut

```
                                                    Page 80
 1   off on a localized basis?

 2            MR. NISHIMOTO:  Objection.  Form.

 3            THE WITNESS:  I'm not sure there is such a thing

 4   as "normally."  In this particular patent it seems that

 5   the intention of the inventors was to in fact provide

 6   for the capability where the second portion of the

 7   display screen and associated sensors are both powered

 8   off.

 9   BY MR. HECHT:

10       Q.  What is your understanding of how touch sensors

11   work?

12       A.  What specifically are you interested in?

13       Q.  Terms of how power is managed?

14       A.  Power is generally managed by controlling the

15   amount of current and voltage that goes into a

16   particular hardware device.

17       Q.  Is that done on a sensor-wide basis, or can that

18   be done on a localized basis?

19       A.  It depends on how a particular piece of hardware

20   is designed.

21       Q.  Are you aware of any smart phone that has

22   capacity of such touch screen that would permit

23   localized powered-off functionality?

24       A.  I was asked to opine on the particular patent

25   here.  This particular patent does indicate the
```

1   capability to turn off both a portion of the display and

2   associated sensors.

3          I have also provided references to other patents

4   that clearly show that this capability existed at that

5   time.

6      Q.  How much power do touch sensors draw, compared

7   to the screen?

8          MR. NISHIMOTO:  Objection.  Form.

9          THE WITNESS:  This strongly depends on the

10  particular design.

11  BY MR. HECHT:

12     Q.  Is it generally more or less than the display

13  screen?

14         MR. NISHIMOTO:  Objection.  Form.

15         THE WITNESS:  That's going to strongly -- the

16  relationship between power of touch sensors and the

17  screen will strongly depend on the technology that is

18  used and their relative size and how their power is

19  managed.

20  BY MR. HECHT:

21     Q.  Have you ever seen a touch sensor that used more

22  power than a display?

23     A.  I'm not sure.

24     Q.  Do most touch screens continually receive input,

25  even if they aren't used to detect a touch screen user?

1    organized collection of data?

2        A.   So, as I said, I was asked to provide an opinion

3    on specifically term "graphical content data structure"

4    as it relates to Patents '427 and '328, and I do believe

5    that that term should be described as an organized

6    collection of graphics data.

7        Q.   So you have no opinion on what a data structure

8    is?

9        A.   I was not asked to provide an opinion on

10   anything other than the terms that are listed on

11   Exhibit 1.

12       Q.   Do you think the term "graphical content data

13   structure" in the context of the patent is indefinite?

14       A.   As I said, I believe the term "graphical content

15   data structure" can most clearly be described as an

16   organized collection of graphics data.

17       Q.   And what's graphics data?

18       A.   Graphics data is something that is described in

19   the patent as a part of when it refers to graphical

20   content data structure.

21       Q.   Can you give me examples of graphics data?

22       A.   Well, why don't we take a look where graphical

23   content data structure appears.

24            Okay.  So in Figure 28 it states, "Receive a

25   graphical content data structure comprising the content

1      Q.  Could they have used the graphics data structure

2   and meant the same thing?

3      A.  I do not know what the inventor might have

4   wanted to do.  This is not my place to speak.  What I

5   was asked to opine on is what is the best way to

6   interpret graphical content data structure in the light

7   of what the person of ordinary skill in the art at the

8   time of this patent would have understood, given the

9   information that I've been provided.

10     Q.  Let's move on.

11         What is your experience with unlock images in

12  phones?

13         MR. NISHIMOTO:  Objection.  Form.

14         THE WITNESS:  "Unlock images in phones" is a

15  term that is actually provided as a part of a '612

16  Patent that I was asked to provide an opinion on, and

17  that unlocked image I believe is best described as

18  graphical image on the display that may be used to

19  unlock the device, again as it applies to the context of

20  '612 Patent.

21  BY MR. HECHT:

22     Q.  Is the unlock image interactive?

23     A.  So unlock image was actually defined

24  specifically as a part of intrinsic evidence as well.

25  In fact, there is a patent that shows up right on the

1    front of '612 Patent, and I believe it was '721.  This

2    is -- this should be the last line in the Exhibit 1,

3    Table B on page 10, the top box of the page.  I think

4    it's Chaudhri '721 Patent that in fact defines the

5    unlock image.  And it defines it, I believe, exactly the

6    same as what our construction is, graphical image on the

7    display that may be used to unlock the device.  So I

8    believe that a person of ordinary skill in the art and

9    the inventor had a very specific definition in mind;

10   otherwise, they would not have used the definition that

11   was listed on their patent.

12       Q.   What definition is listed on their patent?

13       A.   So they listed --

14       Q.   Sorry.  You're talking about Chaudhri?

15       A.   They listed Chaudhri as a reference, which means

16   they clearly knew how unlock image was defined, so I

17   take them seriously.

18       Q.   Is it your position that listing a patent on the

19   face of another patent means that you're adopting all

20   the definitions in the previous patents that are listed?

21       A.   I believe that when one lists references on a

22   patent, that one is very familiar with those references.

23   So a term such as "unlocked image" clearly was familiar

24   to the person of ordinary skill in the art at the time,

25   and also to the inventors.  They're also very familiar

1     A.   Okay.

2     Q.   This is describing -- Figure 25 at line 31,

3  beginning at line 31.

4     A.   Okay.

5     Q.   It says, "Figure 25 illustrates a display power

6  management module for managing display power

7  consumption, according to some embodiments.  Screen

8  power management module 2500 includes a configuration

9  module," and then it goes on.

10        The next sentence says, "Screen power management

11  module 2500 receives as input system events 2550 and

12  user stimulus 2560, stores existing state information

13  2570 and screen portion transition conditions 2580, and

14  generates as output new state information 2590."

15        Now, the next paragraph talks about what some of

16  those elements do.  "In some embodiments, configuration

17  module 2510 allocates display screen space to a first

18  portion of the display screen," and then it goes on.

19        Did you consider the description of the steps

20  here in forming your opinion on what the power

21  management module is?

22     A.   I certainly considered the claims and the

23  specification, along with file history.

24     Q.   Including the algorithm for managing power?

25        MR. NISHIMOTO:  Objection.  Form.

1          THE WITNESS:  I do not believe that the word
2     "algorithm" appears here.
3     BY MR. HECHT:
4          Q.  The word "algorithm" does not -- I don't know if
5     it appears.  I didn't see it.  But does the -- what is
6     an algorithm?
7          A.  I was not asked to provide an opinion on that.
8          Q.  Well, what is your practical understanding of
9     what an algorithm is?
10          A.  So at a very high level, my inclination is to
11     say that it would be a sequence of instructions and that
12     provide for specific function.  However, as I said, I
13     was not asked to provide an opinion, so this is just
14     very preliminary.
15          Q.  Okay.  I have some questions on your research.
16     We have the list of all your papers.  Would you mind
17     going through that list and flagging for me any papers
18     or research or publications that relates to touch
19     sensors.
20          A.  When you say "relates to," what exactly do you
21     mean?
22          Q.  Anything, any kind of analysis on touch sensors
23     cited in the paper.
24          A.  So anything done with touch sensors in any way.
25     Is that correct?