# EXHIBIT I

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF TEXAS

3    ------------------------------------x

     DARELTECH, LLC,

4                      Plaintiff,

                                      4:18-CV-00702

5            v.

6    SAMSUNG ELECTRONICS CO., LTD. and

     SAMSUNG ELECTRONICS AMERICA, INC.,

7

                     Defendants.

8    ------------------------------------x

     SAMSUNG ELECTRONICS CO., LTD. and

9    SAMSUNG ELECTRONICS AMERICA, INC.,

10           Counterclaim-Plaintiffs,

11           v.

12   DARELTECH, LLC,

13           Counterclaim-Defendant.

     ------------------------------------x

14

15            DEPOSITION OF JUSTIN GRANT

16                New York, New York

17             Thursday, October 24, 2019

18

19

20

21

22

23   Reported by:

     Frank J. Bas, RPR

24   JOB NO. 170568

25

1                          J. GRANT

2          Q.   Are you familiar with the document

3    in front of you?

4          A.   Yes.

5          Q.   Is this a copy of your CV?

6          A.   Yes.

7          Q.   Could you go ahead and flip through

8    it and just make sure it's up to date for me.

9               (The witness reviews document.)

10              MR. BAITCHEV:  I am sorry.  And

11         just for the record, it's marked --

12         the document I handed him is marked

13         exhibit 1?

14              COURT REPORTER:  Yes.

15              MR. BAITCHEV:  Thank you.

16         A.   It looks to be up to date.

17         Q.   Could you please take a look at the

18   last page of your CV, under "Education."  It

19   says that you received a Bachelor of Science

20   in marketing from University of Tampa in 2007,

21   is that correct?

22         A.   It is.

23         Q.   Could you please explain how one

24   gets a Bachelor in Science in marketing?

25              MR. HECHT:  Objection.

J. GRANT

1

2     A.   That's just what they called it.

3     Q.   So do you know the difference

4  between a Bachelor of Science and a Bachelor

5  of Arts?

6          MR. HECHT:  Objection.

7     A.   I'm not a degree person, so you

8  would have to ask the University of Tampa.

9     Q.   Maybe this might clear things up.

10         Could you please tell me about some

11  of the courses you took while getting that

12  degree?  For instance, did you take any

13  classes in electrical engineering?

14    A.   I did not.

15    Q.   Did you take any classes in

16  computer engineering?

17    A.   Computer science, yes.

18    Q.   How many classes did you take in

19  computer science?

20    A.   I don't remember off the top of my

21  head.

22    Q.   Did you take more than one class in

23  computer science?

24    A.   Yes.

25    Q.   Did you take more than three

1                          J. GRANT

2    classes?

3         A.    I can't remember that much.

4         Q.    More than five?

5         A.    Probably not.

6         Q.    So somewhere between one and five?

7         A.    (No response.)

8         Q.    Did you take foundational classes,

9    such as, you know, English, humanities, basic

10   science classes, as part of your

11   prerequisites?

12            MR. HECHT:  Objection to form.

13        A.    I did take prerequisite classes,

14   yes.

15        Q.    Could you just detail some of those

16   prerequisite classes that you remember?

17        A.    English.  One was in IT, or

18   computer science.  I believe one was in math.

19   And I believe one was in biology.

20        Q.    One more question about the classes

21   you took.  Do you remember any other classes

22   that you took that in your opinion might be

23   relevant to the scope of your expert opinion

24   today?

25        A.    In college?

1                           J. GRANT

2    version it had to be logged out after 30

3    minutes to stay HIPAA-compliant, and we saw

4    that as a power savings as well.

5         Q.    Anything else that you saw as power

6    savings?

7         A.    Not at this time.

8         Q.    Anything else that you think is

9    relevant from that position to your opinion in

10   this case?

11        A.    Yeah, I think all of the

12   technologies in the software and hardware

13   integration dealing with notifications to the

14   phone gave good experience to -- and

15   background so that I could better advise on

16   this case.

17        Q.    You mentioned hardware.  To what

18   extent did you work with hardware?

19        A.    Well, the text messages that we

20   sent were from a web application and they were

21   delivered on the user's mobile device.  And

22   then we had to create the screens to be

23   reactive so when the person hit the link in

24   the text message, it would open up, be

25   visually, you know, usable on the screen, and

1                       J. GRANT

2    we had to code that in to be able to do that

3    and react to the screen size with different

4    graphics, like, for example, the logo, and we

5    had to code it for numerous different phones

6    and on numerous different operating systems on

7    those phones.

8               We also accessed the location from

9    the phone operating system, so we tapped into

10   the hardware on an individual's phone to get

11   their location.

12       Q.   But you were not doing any

13   modifications to hardware itself?

14               MR. HECHT:  Objection to form.

15       A.   No.  I don't believe so.

16       Q.   So let's move on to FlexDev LLC.

17   What is the date range for that entry?

18       A.   It's not on here, but on my

19   LinkedIn, September 2016 to present.

20       Q.   So you are still working at

21   FlexDev?

22       A.   Yes.

23       Q.   And what is your position at

24   FlexDev?

25       A.   I'm the CEO/founder.  I wear all

1                          J. GRANT

2    the different hats.

3          Q.    You wear all the hats, okay.

4                Do you have a partner in that

5    venture?

6          A.    I do not.

7          Q.    So you manage both -- what does

8    FlexDev do?

9          A.    It is a development firm for

10   creating applications.

11         Q.    And what is your role in the

12   creation of applications?

13         A.    I do everything.  I manage the

14   team.  I manage the engineers.  I manage the

15   projects.  Execute the projects.  I sell

16   everything.  If something has a problem, I

17   troubleshoot it.  I do all the billing.

18   Basically everything that you understand in a

19   business.

20         Q.    It says you have a team of 20 to 25

21   engineers at any given time.  Is that correct?

22         A.    I believe it says 10 to 25

23   engineers.

24         Q.    I am sorry.  My bad.  Yes.  10 to

25   25.

1                           J. GRANT

2          A.   Yes.  At any given time we work

3    with between 10 to 25 contract engineers,

4    depending on what projects are sold or are

5    needing to be executed.

6          Q.   And are they the ones who are

7    developing the apps for clients?

8          A.   Yes.

9          Q.   And are you personally developing

10   any apps for clients?

11         A.   I am not at this time.

12         Q.   All right.  Let's move on to

13   Rundown Pro.

14              Can you please tell me the date

15   range that's supposed to be for that company?

16   I know it's not reflected in your CV.

17         A.   January 2018 to present.

18         Q.   What's your position at Rundown?

19         A.   Co-founder and CEO.

20         Q.   So do you have a partner in this

21   venture?

22         A.   I do.

23         Q.   Just one partner or more than one?

24         A.   Just one.

25         Q.   What are your duties?

1                        J. GRANT

2           upscaling, the specification does not

3           define upscaling, and an ordinary

4           interpretation of upscaling is

5           incompatible with replacing one display

6           element with another.

7           Q.    So let's go on to the second one,

8      then.  Just read both in context.  Okay?

9      Could you read the second sentence out loud,

10     please?

11          A.    (As read):

12               As such, Mr. Grant may provide

13          evidence regarding his opinion that a

14          POSITA would understand that the

15          applicants of the '427 and '328 patents

16          acted as their own lexicographer with

17          respect to the term mathematical

18          upscaling and related terms.

19          Q.    Okay.  What does it mean to act as

20     their own lexicographer?

21          A.    That they are defining the term

22     "mathematical upscaling" in their own terms.

23          Q.    Are you familiar with the

24     requirements to meet the lexicographer rule in

25     claim construction, sir?

1                           J. GRANT

2     initially when I re-looked at this document,

3     nothing stood out right away.  But I

4     referenced it for a reason.

5          Q.   And what was that reason?

6          A.   Give me one second.

7               (The witness reviews document.)

8     BY MR. PARK:

9          Q.   Sir, the only citation to it -- or

10    the relevant citation is on page 4, or rather,

11    3 and 4.  You're looking through the entire

12    document.  But if you could just look at 3 and

13    4, that's what I am asking the question about.

14         A.   Okay.  That's helpful.  I believe,

15    because this particular verbiage here is

16    relevant to --

17         Q.   When you say "this particular," I'm

18    sorry, just for the record you're pointing to

19    DARELTECH_000433, right?

20         A.   Correct.

21         Q.   Okay.

22         A.   So the underlying language here,

23    which is the interview summary, or the

24    substance of the interview as noted by the

25    examiner, was relevant because it had somewhat

1                        J. GRANT

2  confusing verbiage stating (as read):

3            Turning off touch detection sensors

4        of the display screen, which are

5        incapable of receiving user input.

6            That related back to a prior

7  amendment or change that the examiner had

8  made, specifically stating that the user input

9  did indeed have power, although the screen

10 was -- although the screen was turned off for

11 power reasons, to summarize.

12           I can give you the exact language.

13 Yeah, currently amended -- so I am looking at

14 DARELTECH_0000425, number 8.

15           So the language in the interview

16 summary was a little confusing, compared to

17 what was currently amended (as read):

18           A multi-function device comprising

19       one or more processors, a display screen

20       and -- underlined, and associated

21       sensors.

22           Because the display screen and the

23 associated sensors are two separate items,

24 components, I'll call them, and as a POSITA

25 would read this, those items are complementary

1               J. GRANT

2    to each other, but although the display screen

3    is off, the user input would still be able to

4    be collected, and a POSITA would say it should

5    be -- it should continue to be collected,

6    although the display screen is off for data

7    purposes and receiving user input, but may

8    not -- you may not respond to it.  Or let's

9    say, for example, turn the screen on.

10        Q.   Are you done, sir?

11        A.   Yes.

12        Q.   Okay.  So I don't understand what

13   you say is confusing between the two.

14        A.   I think the exact verbiage is

15   confusing, because if you were to turn -- it

16   says "corresponding independent claims to

17   recite turning off touch detection sensors of

18   the display."

19             So potentially implied that those

20   may be the same thing.

21             Whereas the touch sensors are, from

22   a POSITA perspective, 100 percent separate

23   from the display screen.  And the display

24   screen would never be able to get user input,

25   whereas the touch sensors are what receive

J. GRANT

1

2   that user input.  Therefore, the display

3   screen was what would be turned off for power

4   management in the context of the patent,

5   whereas the -- turning off the power to the --

6   like the touch detection sensors, would not

7   only minimally save you a little bit of power,

8   it also would not be of interest from a POSITA

9   perspective because in general you want to

10  collect as much user data as possible.  And

11  doing that via the touch sensors, although the

12  display has been turned off for power

13  management reasons, would still be

14  advantageous to collect that data from the

15  user.

16          Does that make sense?

17      Q.   Not really.  I thought -- not

18  really.

19          So let me try to ask a question

20  that maybe you can give a more cogent answer

21  to.

22          So when it says incapable of

23  receiving -- well, let me take a step back.

24  Let's make sure we agree on what we agree on,

25  which is if you turn off the touch sensors,

1                          J. GRANT

2     on that specific question.

3          Q.   Do you know now?  Apart from having

4     an opinion, do you know?  Based on your years

5     of experience and what you say qualifies you

6     as a POSITA do you know, sitting here?

7          A.   Do I know what specifically?

8          Q.   Whether it is possible to turn off

9     associated sensors, sensors associated with

10    the display, for part of the display?

11         A.   I would have to take time and

12    research if that's possible, because I

13    haven't -- I have not thought about that

14    scenario specifically for this.

15         Q.   Okay.  So your construction of

16    "incapable of receiving input," do you see

17    that, which is on page 5?

18         A.   I see it, yes.

19         Q.   And do you see the construction in

20    page 4 of the term that includes "incapable of

21    receiving user input"?  Do you see that?

22         A.   I see the claim term on page 4 and

23    5, yes.

24         Q.   So do you believe that the term

25    "incapable of receiving user input" when

1                           J. GRANT

2      somehow used separately should be construed

3      differently from when it's used in the phrase

4      above?

5           A.   I think it should say exactly what

6      it says there.

7           Q.   So it should have two different

8      definitions, right?

9           A.   As the constructions state here, I

10     constructed them in a different way.

11          Q.   Why?

12          A.   Because that's how a POSITA would

13     understand it --

14          Q.   Why?

15          A.   -- in the context of the patent.

16          Q.   Let me put it a different way.

17               What evidence would you give to the

18     Court to say that they should be construed

19     differently?

20          A.   All of the evidence on page 4

21     and 5, listed under the plaintiff's evidence,

22     intrinsic and extrinsic, as well as the patent

23     and file history.

24          Q.   Okay.  So nothing specific, no

25     reasoning stands out in particular?  The Court